# White Skin Does Not Make You White + Phrygians & Hindus

## United States v. Cartozian, 6 F.2d 919 (D. Or. 1925)

**US District Court for the District of Oregon - 6 F.2d 919 (D. Or. 1925)**
**July 27, 1925**

---

**6 F.2d 919 (1925)**

**UNITED STATES**
v.
**CARTOZIAN.**

**District Court, D. Oregon.**

July 27, 1925.

John S. Coke, V. W. Tomlinson, and J. O. Stearns, Jr., all of Portland, Or., for the United States.

McCamant & Thompson, of Portland, Or., and William D. Guthrie, of New York City, for defendant.

WOLVERTON, District Judge.

This is a suit on the part of the government to cancel defendant's certificate of naturalization, on the ground that, at the time of the issuance of his certificate, he was not, nor is he now, entitled to naturalization as a citizen of the United States.

Defendant is a native of that part of the Turkish Empire known as Turkey in Asia, or Asia Minor, having been born in Sivas, which is located in Western Armenia, towards Anatolia, and is of Armenian blood and race. It is alleged that he is not a free white person within the meaning of the naturalization laws of Congress. No charge of fraud is made, and the sole question to be determined is whether defendant is to be classed, for naturalization purposes, as a "free white person," as those words are used in section 2169, R. S. (Comp. St. § 4358).

It is now judicially determined that the mere color of the skin of the individual does not afford a

practical test as to whether he is eligible to American citizenship, as that differs greatly among persons of the same race, "even among Anglo-Saxons, ranging by imperceptible gradations from the fair blond to the swarthy brunette; the latter being darker than many of the lighter hued persons of the brown or yellow races." Ozawa v. United States, 260 U.S. 178, 197, 43 S. Ct. 65, 69 (67 L. Ed. 199).

The test is racial, and for practical purposes of the statute must be applied to a group of living persons now possessing in common the requisite characteristics for naturalization. Nor is it one to be wholly determined by ethnological and scientific research, but it must satisfy the common understanding that the racial characteristics are now the same, or sufficiently so to justify the interpreters of the statute written in the words of common speech for common understanding by unscientific men in classifying such persons together in the statutory category as white persons. United States v. Thind, 261 U.S. 204, 209, 43 S. Ct. 338, 67 L. Ed. 616. In defining the type of person eligible to citizenship, the court uses this language:

"The words of familiar speech, which were used by the original framers of the law, were intended to include only the type of man whom they knew as white. The immigration of that day was almost exclusively from the British Isles and Northwestern Europe, whence they and their forbears had come. When they extended the privilege of American citizenship to `any alien, being a free white person,' it was these immigrants bone of their bone and flesh of their flesh and their kind whom they must have had affirmatively in mind. The succeeding years brought immigrants from Eastern, Southern, and Middle Europe, among them the Slavs and the dark-eyed, swarthy people of Alpine and Mediterranean stock, and these were received as unquestionably akin to those already here and readily amalgamated with them. It was the descendants of these, and other immigrants of like origin, who constituted the white population of the country when section 2169, re-enacting the naturalization test of 1790, was adopted; and there is no reason to doubt, with like intent and meaning."

It was not deemed necessary in the Thind Case to decide what, if any, people of primary Asiatic stock came within the words of the section. The thought of the court, speaking generally, is that each individual case must be determined upon its own peculiar **\*920** characteristics, to be gathered in terms of the language of common understanding in the realm at the time of the adoption of the statute.

That the Armenians are of the Alpine stock can scarcely be doubted. The earliest authorities so classify them, as well as those coming later. Herodotus, book 7, c. 73 (Rawlinson's Translation [3d Ed.] vol. 4, p. 67), classifies them as Phrygians, but during their abode in Europe they bore the name of Brigians.

According to Strabo, book XI, § 14, there exists a sort of relationship between the Medes and the Armenians on the one hand, and the Thessalians on the other. Strabo lived about the middle of the first century B. C.

D. C. Brinton, in his work on Races and Peoples, p. 167, says: "Its latest contingent, the Armenian people, was a branch of the Thracian Briges and occupied their territory in Asia Minor about 700 B. C."

H. F. B. Lynch, Armenia, Travels and Studies, London, 1901, vol. 2, p. 67: "All the evidence points to the conclusion that they [the Armenians] entered their historical seats from the west, as a branch of a considerable immigration of Indo-European peoples, crossing the straits from Europe into Asia Minor

and perhaps originally coming from their homes in the steppes north of the Black Sea."

W. Z. Ripley, in Races of Europe, p. 448, referring to Von Luschan as most competent authority, declares: "The continuity of the Alpine race across Asia Minor cannot be doubted."

The witness Roland Burrage Dixon says of Von Luschan that he "was one of the outstanding anthropologists of Germany, who died this last year." He says also that Prof. A. C. Haddon, professor of anthropology at Cambridge University, in his work The Races of Man and their Distribution, pp. 15, 16, "classes the Armenians specifically as belonging to the Alpine race, grouping them with the Cevenoles of Central Europe and the Dinaric group in the Balkan region, which he regards as `probably an offshoot from the Anatolian,' and which, in his understanding, is essentially synonymous with Armenian." Dixon, who himself is an author, and has written a work entitled "The Racial History of Man," classifies the Armenians as "unquestionably of the Alpine type." Many authorities are referred to by him, all confirming the foregoing declarations of the authors noted.

The witness Franz Boas, professor of anthropology, Columbia University, a lecturer and author on the subject, says: "The Alpine group is divided nowadays into the western Alpine and the Dinaric type." Dinaric "is derived from the Dinaric Alps, or the Eastern Alps, and that term is taken from the name of the highest mountain, Dinara." Those Alps are located "northeast of the Adriatic." Prof. Boas, further referring to the authors and writers mentioned by Dixon in his testimony, considers them entirely reliable, and continues: "The weight of the authority has been such, that their conclusions have been accepted without hesitation, particularly the evidence in regard to the European origin of the Armenians and their migration into Asia Minor. The evidence is so overwhelming that nobody doubts any more their early migration from Thrace across the Hellespont into Asia Minor."

Although the Armenian province is within the confines of the Turkish Empire, being in Asia Minor, the people thereof have always held themselves aloof from the Turks, the Kurds, and allied peoples, principally, it might be said, on account of their religion, though color may have had something to do with it. The Armenians, tradition has it, very early, about the fourth century, espoused the Christian religion, and have ever since consistently adhered to their belief, and practiced it. Whatever analogy there may be or may exist between the Caucasian and the white races that may be of assistance in the present controversy, the alliance of the Armenians with the Caucasians of Russia has ever been very close. Indeed, the Armenians have for many generations, possibly centuries, occupied territory in Caucasian Russia, have intermingled freely and harmoniously with that people, and the races mix and amalgamate readily and spontaneously. This is strongly evidentiary of the kinship of the two types of people, and that both are of the Alpine stock. The status of these people thus evolved would seem to be practically conclusive of their eligibility to citizenship in the United States, seeing that they are of Alpine stock, and so remain to the present time, without appreciable blending with the Mongolian or other kindred races.

But to pursue the inquiry further, it may be confidently affirmed that the Armenians are white persons, and moreover that they readily amalgamate with the European and white races.

**\*921** Dr. Paul Rohrbach of Berlin, a scholar of note, who was for eight years professor of geography

and political economy in a commercial academy in Berlin, has traveled extensively in many countries, including Armenia in Asia Minor, has made a specialty of studying history, philology, and ethnology, particularly with reference to Russia, Asia Minor, and the Near East, and has written six or seven books and a number of magazine articles, gives it as his experience that the color line is not drawn against the Armenians anywhere in the world. As to amalgamation with the white races, he affirms that there are thousands and thousands of intermarriages between Russians and Armenians; there existing no prejudice between these races of people. He mentions an Armenian who became a count in Russia, marrying a Russian countess or baroness, and an Armenian missionary who married a German baroness. Broadening the scope of his reply, he found Armenians intermarrying with white people everywhere.

The witness Dixon, a profound scholar, now professor of anthropology at Harvard University, who has written extensively on anthropology and ethnology, and who attended President Wilson as a government representative on the subject of ethnography during the Peace Conferences at Versailles, gives it as his conviction that the weight of authority is overwhelmingly in favor of the proposition that Armenians are white persons, and that Caucasian and European, as used in common speech, are practically synonymous; at least such is the case in current usage. He further affirms that the Armenians readily assimilate with the people of France, Germany, and Russia.

Dr. Barton is foreign secretary of the American Board of Commissioners for Foreign Missions. He established his home at Harpoot in September, 1885, and remained there until the summer of 1892, when he returned to this country. In 1919 he went again, as the head of the relief expedition under the Near East relief, into Turkey and Armenia, where he carried on relief work. During his early work in his mission field, he prepared an article for the Encyclopedia of Missions, on the subject of "Armenia and the Armenians." He testifies: "I never have heard it suggested that they [the Armenians] were not white. In all the conversations with Americans and foreigners, we have always regarded them as white. * * * There were occasionally colored people came through the country, but they were always marked as completely distinguishable from the Armenians, who were never referred to in any way except as white, never thought of in any other terms than white persons." When asked, "As the terms `white' and `white persons' are commonly and popularly used in the United States and Canada and Europe, would you class the Armenians in your opinion as `white persons'?" he answered, "I surely would." Later he says, "It is generally considered that they [the Armenians] are of the Alpine class of whites." The witness further affirms that they readily assimilate with the Europeans and the people of this country. Within his own information, he knows of ten or fifteen Armenians in Boston who have married American wives.

Dr. Boas affirms, after reference to many authorities on anthropology and ethnology, that "it would be utterly impossible to classify them [Armenians] as not belonging to the white race."

M. Vartan Malcolm, who was born in Sivas, Armenia, has been naturalized in this country, is an attorney of standing in New York City, and has written a work on the Armenians in America, was a witness in the case at bar. He has gathered many statistics respecting his own race in the United States. He shows that, according to the census of 1920, there were then foreign-born Armenians in the United

States, 37,647; native white persons, both parents Armenian, 14,047; native white persons, one parent Armenian and the other not, 1,146 making a total of 52,840. From the same census, he finds the number of Armenians naturalized to be 10,574. He also gives a table as a result of special inquiry made of 339 persons; the object being to ascertain the extent of intermarriage among the Armenians, which discloses that of the number, 257 were married 125 to Armenian girls, and 132 to native white Americans, or, in a few instances, girls of Irish, German, Swiss, or French parentage. True, this information was gathered through means of questionnaires sent out by witness, but he states that he has personal acquaintance with by far the larger proportion of the persons of whom such inquiry was made.

Prof. Boas cites a work of Julius Drachsler, entitled "Intermarriage in New York City," compiled by the examination of about 100,000 marriage certificates issued by the clerk of the city of New York, from which it is deduced that for the first generation of immigrants the intermarriage rate is 10.4 per cent. "That," says the witness, "means that 10 per cent. of the first generation of **\*922** immigrants marry people not belonging to their nationality. \* \* \* Now the rate for Armenians is practically the same as the average rate. It is 9.63."

Mrs. Otis Floyd Lamson, who was born in Erzerum, Armenia, acquired her principal education at the University of Berlin, having mastered six or seven languages, has traveled extensively, has taught French and German in a girls' school in this country, has also tutored, is a member of many social and educational clubs and organizations, was naturalized in 1911, married an American citizen born in Wisconsin, and is very intellectual and highly cultivated, was called as a witness, and gave it as her testimony that "the Armenians here very readily assimilate the American home life, provided they speak English." In her experience, she has found no discrimination respecting the intermarriage of men and women of Armenian blood with native Americans; nor has she found that the question of color or race enters as an obstacle.

I have confined my investigation to the testimony found in the record, and have made no attempt at independent investigation respecting race, color, assimilation, or amalgamation.

The testimony here adduced would seem to meet the concept essential to eligibility for naturalization under section 2169, R. S., first, that Armenians in Asia Minor are of the Alpine stock, of European persuasion; second, that they are white persons, as commonly recognized in speech of common usage, and as popularly understood and interpreted in this country by our forefathers, and by the community at large, when section 2169 was adopted by Congress, and later confirmed; third, that they amalgamate readily with the white races, including the white people of the United States.

As an authority of analogy respecting the eligibility of Armenians to naturalization, see In re Halladjian (C. C.) 174 F. 834.

The judgment of the court will therefore be that the bill of complaint be dismissed.

# United States v. Bhagat Singh Thind, 261 U.S. 204 (1923)

## U.S. Supreme Court

United States v. Bhagat Singh Thind, 261 U.S. 204 (1923)

**United States v. Bhagat Singh Thind**

**No. 202**

**Argued January 11, 12, 1923**

**Decided February 19, 1923**

**261 U.S. 204**

*CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS*

*FOR THE NINTH CIRCUIT*

*Syllabus*

1. A high caste Hindu, of full Indian blood, born at Amrit Sar, Punjab, India, is not a "white person" within the meaning of Rev.Stats., § 2169, relating to the naturalization of aliens. P. 261 U. S. 207.

2. "Free white persons," as used in that section, are words of common speech, to be interpreted in accordance with the understanding of the common man, synonymous with the word "Caucasian" only as that word is popularly understood. P. 261 U. S. 214. *Ozawa v. United States*, 260 U. S. 178.

3. The action of Congress in excluding from admission to this country all natives of Asia within designated limits, including all of India, is evidence of a like attitude toward naturalization of Asians within those limits. P. 261 U. S. 215.

Questions certified by the circuit court of appeals, arising upon an appeal to that court from a decree of the district court dismissing, on motion, a bill brought by the United ,states to cancel a certificate of naturalization.

Page 261 U. S. 206

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

This cause is here upon a certificate from the Circuit Court of appeals requesting the instruction of this Court in respect of the following questions:

"1. Is a high-caste Hindu, of full Indian blood, born at Amritsar, Punjab, India, a white person within

the meaning of § 2169, Revised Statutes? "

Page 261 U. S. 207

"2. Does the Act of February 5, 1917 (39 Stat. 875, § 3) disqualify from naturalization as citizens those Hindus now barred by that act who had lawfully entered the United States prior to the passage of said act?"

The appellee was granted a certificate of citizenship by the District Court of the United States for the District of Oregon, over the objection of the Naturalization Examiner for the United States. A bill in equity was then filed by the United States seeking a cancellation of the certificate on the ground that the appellee was not a white person, and therefore not lawfully entitled to naturalization. The district court, on motion, dismissed the bill (268 F. 683), and an appeal was taken to the circuit court of appeals. No question is made in respect of the individual qualifications of the appellee. The sole question is whether he falls within the class designated by Congress as eligible.

Section 2169, Revised Statutes, provides that the provisions of the Naturalization Act "shall apply to aliens being free white persons and to aliens of African nativity and to persons of African descent."

If the applicant is a white person within the meaning of this section, he is entitled to naturalization; otherwise not. In *Ozawa v. United States*, 260 U. S. 178, we had occasion to consider the application of these words to the case of a cultivated Japanese, and were constrained to hold that he was not within their meaning. As there pointed out, the provision is not that any particular class of persons shall be excluded, but it is, in effect, that only white persons shall be included within the privilege of the statute.

"The intention was to confer the privilege of citizenship upon that class of persons whom the fathers knew as white, and to deny it to all who could not be so classified. It is not enough to say that the framers did not have in mind the brown or yellow races of Asia. It is necessary to go farther and be able to say that, had these particular

Page 261 U. S. 208

races been suggested, the language of the act would have been so varied as to include them within its privileges"

-- citing *Dartmouth College v. Woodward*, 4 Wheat. 518, 17 U. S. 644. Following a long line of decisions of the lower federal courts, we held that the words imported a racial, and not an individual, test, and were meant to indicate only persons of what is popularly known as the Caucasian race. But, as there pointed out, the conclusion that the phrase "white persons" and the word "Caucasian" are synonymous does not end the matter. It enabled us to dispose of the problem as it was there presented, since the applicant for citizenship clearly fell outside the zone of debatable ground on the negative side; but the decision still left the question to be dealt with, in doubtful and different cases, by the "process of judicial inclusion and exclusion." Mere ability on the part of an applicant for naturalization to establish a line of descent from a Caucasian ancestor will not *ipso facto* and necessarily conclude the inquiry. "Caucasian" is a conventional word of much flexibility, as a study of the literature dealing with racial questions will disclose, and, while it and the words "white persons" are treated as synonymous

for the purposes of that case, they are not of identical meaning -- *idem per idem.*

In the endeavor to ascertain the meaning of the statute, we must not fail to keep in mind that it does not employ the word "Caucasian," but the words "white persons," and these are words of common speech, and not of scientific origin. The word "Caucasian" not only was not employed in the law, but was probably wholly unfamiliar to the original framers of the statute in 1790. When we employ it, we do so as an aid to the ascertainment of the legislative intent, and not as an invariable substitute for the statutory words. Indeed, as used in the science of ethnology, the connotation of the word is by no means clear, and the use of it in its scientific sense as an equivalent

Page 261 U. S. 209

for the words of the statute, other considerations aside, would simply mean the substitution of one perplexity for another. But, in this country, during the last half century especially, the word, by common usage, has acquired a popular meaning, not clearly defined to be sure, but sufficiently so to enable us to say that its popular, as distinguished from its scientific, application is of appreciably narrower scope. It is in the popular sense of the word, therefore, that we employ is as an aid to the construction of the statute, for it would be obviously illogical to convert words of common speech used in a statute into words of scientific terminology when neither the latter nor the science for whose purposes they were coined was within the contemplation of the framers of the statute or of the people for whom it was framed. The words of the statute are to be interpreted in accordance with the understanding of the common man from whose vocabulary they were taken. *See Maillard v.Lawrence,* 16 How. 251, 57 U. S. 261.

They imply, as we have said, a racial test; but the term "race" is one which, for the practical purposes of the statute, must be applied to a group of living persons now possessing in common the requisite characteristics, not to groups of persons who are supposed to be or really are descended from some remote common ancestor, but who, whether they both resemble him to a greater or less extent, have at any rate ceased altogether to resemble one another. It may be true that the blond Scandinavian and the brown Hindu have a common ancestor in the dim reaches of antiquity, but the average man knows perfectly well that there are unmistakable and profound differences between them today, and it is not impossible, if that common ancestor could be materialized in the flesh, we should discover that he was himself sufficiently differentiated from both of his descendants to preclude his racial classification with either. The question for determination

Page 261 U. S. 210

is not, therefore, whether, by the speculative processes of ethnological reasoning, we may present a probability to the scientific mind that they have the same origin, but whether we can satisfy the common understanding that they are now the same or sufficiently the same to justify the interpreters of a statute -- written in the words of common speech, for common understanding, by unscientific men -- in classifying them together in the statutory category as white persons. In 1790, the Adamite theory of creation -- which gave a common ancestor to all mankind -- was generally accepted, and it is not at all probable that it was intended by the legislators of that day to submit the question of the application of

the words "white persons" to the mere test of an indefinitely remote common ancestry, without regard to the extent of the subsequent divergence of the various branches from such common ancestry or from one another.

The eligibility of this applicant for citizenship is based on the sole fact that he is of high-caste Hindu stock, born in Punjab, one of the extreme northwestern districts of India, and classified by certain scientific authorities as of the Caucasian or Aryan race. The Aryan theory, as a racial basis, seems to be discredited by most, if not all, modern writers on the subject of ethnology. A review of their contentions would serve no useful purpose. It is enough to refer to the works of Deniker (Races of Man, 317), Keane (Man, Past and Present, 445, 446), and Huxley (Man's Place in Nature, 278), and to the Dictionary of Races, Senate Document 662, 61st Congress, 3d Sess.1910-1911, p. 17.

The term "Aryan" has to do with linguistic, and not at all with physical, characteristics, and it would seem reasonably clear that mere resemblance in language, indicating a common linguistic root buried in remotely ancient soil, is altogether inadequate to prove common racial origin. There is, and can be, no assurance that the so-called

Page 261 U. S. 211

Aryan language was not spoken by a variety of races living in proximity to one another. Our own history has witnessed the adoption of the English tongue by millions of negroes, whose descendants can never be classified racially with the descendants of white persons, notwithstanding both may speak a common root language.

The word "Caucasian" is in scarcely better repute. [Footnote 1] It is, at best, a conventional term, with an altogether fortuitous origin, [Footnote 2] which, under scientific manipulation, has come to include far more than the unscientific mind suspects. According to Keane, for example (The World's Peoples 24, 28, 307 *et seq.*), it includes not only the Hindu, but some of the Polynesians [Footnote 3] (that is, the Maori, Tahitians, Samoans, Hawaiians, and others), the Hamites of Africa, upon the ground of the Caucasic cast of their features, though in color they range from brown to black. We venture to think that the average well informed white American would learn with some degree of astonishment that the race to which he belongs is made up of such heterogeneous elements. [Footnote 4]

Page 261 U. S. 212

The various authorities are in irreconcilable disagreement as to what constitutes a proper racial division. For instance, Blumenbach has five races; Keane, following Linnaeus, four; Deniker, twenty-nine. [Footnote 5] The explanation probably is that "the innumerable varieties of mankind run into one another by insensible degrees," [Footnote 6] and to arrange them in sharply bounded divisions is an undertaking of such uncertainty that common agreement is practically impossible.

It may be, therefore, that a given group cannot be properly assigned to any of the enumerated grand racial divisions. The type may have been so changed by intermixture of blood as to justify an intermediate classification. Something very like this has actually taken place in India. Thus, in Hindustan and Berar, there was such an intermixture of the "Aryan" invader with the dark-skinned

Dravidian. [Footnote 7]

In the Punjab and Rajputana, while the invaders seem to have met with more success in the effort to preserve

Page 261 U. S. 213

their racial purity, [Footnote 8] intermarriages did occur producing an intermingling of the two and destroying to a greater or less degree the purity of the "Aryan" blood. The rules of caste, while calculated to prevent this intermixture, seem not to have been entirely successful. [Footnote 9]

It does not seem necessary to pursue the matter of scientific classification further. We are unable to agree with the district court, or with other lower federal courts, in the conclusion that a native Hindu is eligible for naturalization under § 2169. The words of familiar speech, which were used by the original framers of the law, were intended to include only the type of man whom they knew as white. The immigration of that day was almost exclusively from the British Isles and Northwestern Europe, whence they and their forebears had come. When they extended the privilege of American citizenship to "any alien being a free white person," it was these immigrants -- bone of their bone and flesh of their flesh -- and their kind whom they must have had affirmatively in mind. The succeeding years brought immigrants from Eastern, Southern and Middle Europe, among them the Slavs and the dark-eyed, swarthy people of Alpine and Mediterranean stock, and these were received as unquestionably akin to those already here and readily amalgamated with them. It was the descendants of these, and

Page 261 U. S. 214

other immigrants of like origin, who constituted the white population of the country when § 2169, reenacting the naturalization test of 1790, was adopted, and, there is no reason to doubt, with like intent and meaning.

What, if any, people of primarily Asiatic stock come within the words of the section we do not deem it necessary now to decide. There is much in the origin and historic development of the statute to suggest that no Asiatic whatever was included. The debates in Congress during the consideration of the subject in 1870 and 1875 are persuasively of this character. In 1873, for example, the words "free white persons" were unintentionally omitted from the compilation of the Revised Statutes. This omission was supplied in 1875 by the act to correct errors and supply omissions. 18 Stat. c. 80, p. 318. When this act was under consideration by Congress, efforts were made to strike out the words quoted, and it was insisted, upon the one hand, and conceded upon the other, that the effect of their retention was to exclude Asiatics generally from citizenship. While what was said upon that occasion, to be sure, furnishes no basis for judicial construction of the statute, it is nevertheless an important historic incident which may not be altogether ignored in the search for the true meaning of words which are themselves historic. That question, however, may well be left for final determination until the details have been more completely disclosed by the consideration of particular cases as they from time to time arise. The words of the statute, it must be conceded, do not readily yield to exact interpretation, and it is probably better to leave them as they are than to risk undue extension or undue limitation of their meaning by any general paraphrase at this time.

What we now hold is that the words "free white persons" are words of common speech, to be interpreted in accordance with the understanding of the common man, synonymous with the word "Caucasian" only as that

Page 261 U. S. 215

word is popularly understood. As so understood and used, whatever may be the speculations of the ethnologist, it does not include the body of people to whom the appellee belongs. It is a matter of familiar observation and knowledge that the physical group characteristics of the Hindus render them readily distinguishable from the various groups of persons in this country commonly recognized as white. The children of English, French, German, Italian, Scandinavian, and other European parentage quickly merge into the mass of our population and lose the distinctive hallmarks of their European origin. On the other hand, it cannot be doubted that the children born in this country of Hindu parents would retain indefinitely the clear evidence of their ancestry. It is very far from our thought to suggest the slightest question of racial superiority or inferiority. What we suggest is merely racial difference, and it is of such character and extent that the great body of our people instinctively recognize it and reject the thought of assimilation.

It is not without significance in this connection that Congress, by the Act of February 5, 1917, 39 Stat. 874, c. 29, § 3, has now excluded from admission into this country all natives of Asia within designated limits of latitude and longitude, including the whole of India. This not only constitutes conclusive evidence of the congressional attitude of opposition to Asiatic immigration generally, but is persuasive of a similar attitude toward Asiatic naturalization as well, since it is not likely that Congress would be willing to accept as citizens a class of persons whom it rejects as immigrants.

It follows that a negative answer must be given to the first question, which disposes of the case and renders an answer to the second question unnecessary, and it will be so certified.

# IN THE SUPREME COURT OF THE STATE OF UTAH

## ----oo0oo----

## State of Utah,

## Plaintiff and Appellee,

## v.

James W. Mooney, aka James W.B.E. Mooney,

Linda T. Mooney,

and Oklevueha Earthwalks Native American

Church of Utah, Inc.,

Defendants and Appellants.

No. 20010787

F I L E D

June 22, 2004

---

| 2004 UT 49 |
|---|

---

Fourth District, Provo Dep't

The Honorable Gary D. Stott

Attorneys: Mark L. Shurtleff, Att'y Gen., Kris C. Leonard,

Asst. Att'y Gen., Salt Lake City, and David H. T.

Wayment, Provo, for plaintiff

Kathryn Collard, Salt Lake City, for defendants

---

PARRISH, Justice:

¶1 James and Linda Mooney, along with their church, the Oklevueha Earthwalks Native American Church (collectively, the "Mooneys"), have

been charged by the State with multiple felony counts of "engag[ing] in a continuing criminal enterprise" and of engaging in a "pattern of unlawful activity" by possessing and distributing peyote, a controlled substance, to members and visitors in their religious services. The State also seeks forfeiture of the church's property in connection with this alleged criminal activity. The Mooneys moved to dismiss the charges, arguing that a federal regulatory exemption incorporated into Utah law permits them to use and distribute peyote in "bona fide religious ceremonies" because they are members of the Native American Church. The Mooneys also argued that if state law is not interpreted to permit their possession and use of peyote for religious purposes, their prosecution violates their constitutional right to freely exercise their religion, as well as their constitutional rights to due process and equal protection of the law.

¶2 The trial court rejected the Mooneys' arguments, holding that the Mooneys are not entitled to the protection of any exemption for the religious use of peyote because they are not members of a federally recognized Native American tribe. We reverse the trial court's decision, holding that Utah law incorporates a federal regulation exempting from prosecution members of the Native American Church who use peyote in bona fide religious ceremonies. On its face, the federal regulation does not restrict the exemption to members of federally recognized tribes. We therefore rule that the exemption is available to all members of the Native American Church. Any other interpretation is not only inconsistent with the plain language of the exemption, but would fail to provide members of the Native American Church with constitutionally adequate notice that their religious use of peyote could expose them to criminal liability.

## BACKGROUND

### Regulation of Peyote

¶3 A cactus indigenous to the Rio Grande valley of southern Texas and northern Mexico, peyote contains mescaline, which can induce hallucinations and other psychedelic effects in those who consume it. There is a long tradition among some Native American groups of worshiping peyote and of consuming the cactus and experiencing its effects in religious ceremonies. See Peyote Way Church of God, Inc. v. Thornburgh, 922 F.2d 1210, 1212 (5th Cir. 1991); United States v. Boyll, 774 F. Supp. 1333, 1335 (D.N.M. 1991); Native Am. Church v. United States, 468 F. Supp. 1247, 1248 (S.D.N.Y. 1979); see also

Christopher Parker, Note and Comment, A Constitutional Examination of the Federal Exemptions for Native American Religious Peyote Use, 16 BYU J. Pub. L. 89, 89-94 (2001).

¶4 Congress first restricted the possession and sale of peyote in the Drug Abuse Control Amendments of 1965, and classified it as a Schedule I controlled substance in 1970. 21 U.S.C. § 812(c) Schedule I(c)(12) (2004); Boyll, 774 F. Supp. at 1338; Native Am. Church, 468 F. Supp. at 1249. In 1965 and again in 1970, there were efforts in Congress to enact an explicit statutory exception for the use of peyote in bona fide religious ceremonies. Id. These efforts did not succeed, but they led the Bureau of Narcotics and Dangerous Drugs, the predecessor to the agency now known as the Drug Enforcement Agency (the "DEA"), to promulgate a regulatory exemption for the religious use of peyote. Id. That exemption provides as follows:

> The listing of peyote as a controlled substance in Schedule I does not apply to the nondrug use of peyote in bona fide religious ceremonies of the Native American Church, and members of the Native American Church so using peyote are exempt from registration. Any person who manufactures peyote for or distributes peyote to a Native American Church is required to register annually and to comply with all other requirements of law.

21 C.F.R. § 1307.31 (2004). Throughout this opinion, we will refer to this regulatory exemption as the Religious Peyote Exemption, or simply as the federal exemption.

¶5 The religious use of peyote in Native American religious ceremonies became a frequent topic of debate after the United States Supreme Court decided the case of Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990). In Smith, the Court held that the state of Oregon did not violate the Free Exercise Clause of the First Amendment to the United States Constitution when it refused unemployment benefits to certain practitioners of Native American peyote religion who had been fired for illegally using peyote. Id. at 890. The Court announced that a neutral law of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. Id. at 878-80.

¶6 The Smith decision generated a great deal of controversy and motivated Congress to legislate in response. See generally Michael W. McConnell, Religious Freedom, Separation of Powers, and the Reversal

of Roles, 2001 BYU L. Rev. 611, 613-14. One of these responses was
the adoption of the American Indian Religious Freedom Act Amendments
(the "AIRFA Amendments") in 1994. These amendments were based on the
following congressional findings:

> The Congress finds and declares that--
>
> (1) for many Indian people, the traditional ceremonial use of
> the peyote cactus as a religious sacrament has for centuries
> been integral to a way of life, and significant in
> perpetuating Indian tribes and cultures;
>
> (2) since 1965, this ceremonial use of peyote by Indians has
> been protected by Federal regulation;
>
> (3) while at least 28 States have enacted laws which are
> similar to, or are in conformance with, the Federal
> regulation which protects the ceremonial use of peyote by
> Indian religious practitioners, 22 States have not done so,
> and this lack of uniformity has created hardship for Indian
> people who participate in such religious ceremonies;
>
> (4) the Supreme Court of the United States, in the case of
> Employment Division v. Smith, 494 U.S. 872 (1990), held that
> the First Amendment does not protect Indian practitioners who
> use peyote in Indian religious ceremonies, and also raised
> uncertainty whether this religious practice would be
> protected under the compelling State interest standard; and
>
> (5) the lack of adequate and clear legal protection for the
> religious use of peyote by Indians may serve to stigmatize
> and marginalize Indian tribes and cultures, and increase the
> risk that they will be exposed to discriminatory treatment.

42 U.S.C. § 1996a(a) (2004). On the basis of these findings, Congress
directed that

> [n]otwithstanding any other provision of law, the use,
> possession, or transportation of peyote by an Indian for bona
> fide traditional ceremonial purposes in connection with the
> practice of a traditional Indian religion is lawful, and
> shall not be prohibited by the United States or any State. No
> Indian shall be penalized or discriminated against on the
> basis of such use, possession or transportation, including,
> but not limited to, denial of otherwise applicable benefits
> under public assistance programs.

Id. § 1996a(b)(1). For the purposes of these provisions, Congress
defined the term "Indian" to include members of "any tribe, band,

nation, pueblo, or other organized group or community of
Indians . . . which is recognized as eligible for the special
programs and services provided by the United States to Indians
because of their status as Indians." Id. § 1996a(c)(2).

### The Mooneys and the Native American Church

¶7 The Native American Church was formally established in Oklahoma
in 1918. Peyote Way, 922 F.2d at 1212. The formation of this entity
was motivated, at least in part, to protect the religious use of
peyote from early attempts to suppress it. Boyll, 774 F. Supp. at
1336. The Native American Church has now grown to include many local
branches or chapters, including, according to the Mooneys, the
defendant Oklevueha Earthwalks Native American Church.

¶8 James Mooney claims to be a descendant of Native Americans, but
is not a member of any federally recognized tribe. The Mooneys
practiced Native American religion before founding their church, and
provided religious programs and services to inmates of Utah
correctional facilities, both as volunteers and, in Mr. Mooney's
case, as an employee. James and Linda Mooney founded their Oklevueha
Earthwalks Native American Church in April of 1997 in Benjamin, Utah.
Because Texas is the only state in the nation in which peyote is
grown, the Mooneys obtained peyote for use in their church services
by registering and complying with the requirements of the Texas
Department of Public Safety Narcotics Services.

### ANALYSIS

### I. INCORPORATION OF THE RELIGIOUS PEYOTE

### EXEMPTION INTO THE UTAH CONTROLLED SUBSTANCES ACT

¶9 The first issue we address is whether the federal Religious
Peyote Exemption has been incorporated into Utah law. The Utah
Controlled Substances Act (the "Act") provides:

> "Controlled Substance" means a drug or substance included in
> Schedules I, II, III, IV or V of [Utah Code] Section 58-37-4,
> and also includes a drug or substance included in Schedules
> I, II, III, IV, or V of the federal Controlled Substances
> Act, Title II, P.L. 91-513, or any controlled substances
> analog.

Utah Code Ann. § 58-37-2(1)(e)(i) (2002). While peyote is among the
controlled substances listed in Schedule I of section 58-37-4 of the
Utah Code, the preamble to Schedule I provides an exception for

substances that are "specifically excepted" or "listed in another schedule." Id. § 58-37-4(2)(a)(iii) (2002). We must decide whether this qualifying language incorporates the federal Religious Peyote Exemption of 21 C.F.R. § 1307.31 into state law. This is a question of statutory interpretation that we review for correctness without deference to the conclusions of the trial court. See Ward v. Richfield City, 798 P.2d 757, 759 (Utah 1990).[1]

¶10 We hold that the federal exemption for the religious use of peyote in bona fide ceremonies of the Native American Church constitutes a "specific exception" to the listing of peyote as a controlled substance within the meaning of Utah Code section 58-37-4(2)(a)(iii). To interpret the statute otherwise would create a direct conflict with a preemptive federal law, and would raise substantial constitutional impediments to the State's prosecution of the Mooneys.

¶11 Our primary source of guidance in statutory interpretation is the plain and ordinary meaning of the statutory language. Dick Simon Trucking, Inc. v. State Tax Comm'n, 2004 UT 11, ¶ 17, 84 P.3d 1197. Unfortunately, the language of the Utah Controlled Substances Act fails to specify the source of the applicable exceptions. Although the Act explicitly provides that scheduled substances are controlled unless "specifically excepted," Utah Code Ann. § 58-37-4(2)(a)(iii) (2002), it does not address whether the contemplated exceptions are found in state statutes, state regulations, federal statutes, federal regulations, or some combination of these sources.[2] Similarly, although the Act states that scheduled substances are controlled "unless listed in another schedule," id. § 58-37-4(2)(a)(iii), it neither specifies the other contemplated schedules nor addresses the resolution of conflicts arising when a particular substance is listed as controlled on one schedule but listed as exempt under another schedule. In short, the statute does not address the situation presented here, where the substance in question is listed as a controlled substance under one of the state schedules but is listed as exempt under the federal schedules that have been incorporated by reference into the Utah Controlled Substances Act. See id. § 58-37-3. These omissions and inconsistencies render the statutory language ambiguous and require that we turn to other accepted principles of statutory construction.

## A. Preemption by the American Indian

Religious Freedom Act Amendments

¶12 In construing statutes, we are obligated to "avoid interpretations that conflict with relevant constitutional mandates." State v. Mohi, 901 P.2d 991, 1009 (Utah 1995). This canon of interpretation has sometimes been couched as a recognition that "[w]e have a duty to construe statutes to avoid constitutional conflicts." Provo City Corp. v. State, 795 P.2d 1120, 1125 (Utah 1990); see also State v. Lindquist, 674 P.2d 1234, 1237 (Utah 1983) ("[I]t is the duty of this Court to construe a statute to avoid constitutional infirmities whenever possible. We must adopt that construction which will save the statute from constitutional infirmity." (quotation and citations omitted)).

¶13 The Supremacy Clause of the United States Constitution authorizes Congress to preempt state law in areas covered by federal legislation, rendering invalid any state statute that conflicts with a federal act of preemption. U.S. Const. art. VI, cl. 2; Ray v. Atl. Richfield Co., 435 U.S. 151, 158 (1978). We therefore avoid interpreting an ambiguous state statute in a way that would render the statute invalid under an explicitly preemptive federal law. See Martin v. City of Rochester, 642 N.W.2d 1, 18 (Minn. 2002) (interpreting a state statute to avoid conflicting with a preemptive federal law).

¶14 The AIRFA Amendments' prohibition on criminalizing the religious use of peyote constitutes a clear congressional act of preemption against the laws of any state that might otherwise prohibit the use of peyote for religious purposes by Native Americans, as the AIRFA Amendments define them. The AIRFA Amendments provide that "[n]otwithstanding any other . . . law, the use, possession, or transportation of peyote by an Indian for bona fide traditional ceremonial purposes in connection with the practice of a traditional Indian religion . . . shall not be prohibited by . . . any State." 42 U.S.C. § 1996a(b)(1) (2004). Were we to hold that the Utah Controlled Substances Act does not incorporate the federal Religious Peyote Exemption, the Act would prohibit peyote use in all circumstances, thereby running afoul of the AIRFA Amendments. We therefore are persuaded to interpret the Utah Controlled Substances Act to have incorporated the exemption for the religious use of peyote found at 21 C.F.R. § 1307.31.

¶15 The State urges us to hold that the Utah Controlled Substances

Act does not incorporate the federal exemption and suggests that we resolve the resulting preemption problem by holding that the AIRFA Amendments preempt Utah law only to the extent that Utah law criminalizes peyote use by members of federally recognized Native American tribes. This interpretation would leave Utah law available for prosecution of those religious peyote users, such as the Mooneys, who are not members of a federally recognized tribe. While the interpretation advocated by the State would facilitate the result it desires, such an interpretation nevertheless would require that we find the Utah Controlled Substances Act in conflict with federal law. We decline to do so in the face of an equally plausible interpretation that avoids any such conflict.

### B. Constitutional Guarantees of Due Process

¶16 The statutory interpretation urged by the State is also untenable because it raises a serious question as to whether the Mooneys' constitutional due process rights would be violated by a conviction. In this regard, we are again constrained by the principle of statutory construction counseling us to avoid interpretations that are inconsistent with constitutional guarantees.[3] Mohi, 901 P.2d at 1009; Provo City Corp., 795 P.2d at 1125; Lindquist, 674 P.2d at 1237.

¶17 Both the United States and Utah Constitutions protect citizens from deprivation of liberty or property absent due process of law. U.S. Const. amends. V & XIV, § 1; Utah Const. art. I, § 7. The Utah Controlled Substances Act imposes substantial criminal penalties on those found guilty of violating its provisions. Our constitutional guarantees of due process require that penal statutes define criminal offenses "with sufficient definiteness that ordinary people can understand what conduct is prohibited." Kolender v. Lawson, 461 U.S. 352, 357 (1983); State v. MacGuire, 2004 UT 4, ¶¶ 13-14, 84 P.3d 1171; see also In re Discipline of Sonnenreich, 2004 UT 3, ¶ 37, 86 P.3d 712 ("Utah's constitutional guarantee of due process is substantially the same as the due process guarantees contained in the . . . United States Constitution." (quotations and citations omitted)). These guarantees do not permit enforcement of a statute that forbids an act "in terms so vague that [persons] of common intelligence must necessarily guess at [the statute's] meaning and differ as to its application." United States v. Lanier, 520 U.S. 259, 266 (1997) (quotations and citations omitted); see also MacGuire, 2004 UT 4 at ¶ 14.

¶18 Because the Utah Controlled Substances Act does not clearly specify whether it incorporates the Religious Peyote Exemption, a holding that the exemption does not apply would give rise to serious constitutional claims under the due process clauses of the federal and state constitutions. The ambiguity in the statute is such that the scope of its peyote prohibition cannot be decisively interpreted by lawyers, to say nothing of citizens untrained in the law. This weighs strongly against any interpretation that would enable the State to initiate criminal prosecution based on arguably legitimate conduct.

¶19 In summary, we interpret the Utah Controlled Substances Act to have incorporated the Religious Peyote Exemption found at 21 C.F.R. § 1307.31. This interpretation avoids a conflict with the preemptive AIRFA Amendments. It also avoids the constitutional due process claims that would be created by allowing the State to prosecute the Mooneys under a statute that may reasonably be read to have permitted their religious activities.

## II. INTERPRETING THE PEYOTE EXEMPTION IN UTAH LAW

¶20 Having held that the federal exemption for religious peyote use is incorporated into Utah law, we must decide whether the terms of the exemption protect the Mooneys from prosecution. This task requires that we look first at the plain meaning of the regulatory language, and give effect to that meaning unless the language is ambiguous. Thomas v. Color Country Mgmt., 2004 UT 12 ¶ 9, 84 P.3d 1201.

### A. The Plain Meaning of the Religious Peyote Exemption

¶21 The State argues that the Religious Peyote Exemption is available only to members of federally recognized Native American tribes. The Mooneys contend that the exemption is not so limited. The exemption states that it applies to "members of the Native American Church," provided such members are using peyote in bona fide religious ceremonies. James Mooney asserts that his church is one of many chapters or churches that make up the Native American Church, that the peyote was used in bona fide religious ceremonies and that, in acquiring peyote from Texas, his church has registered and otherwise followed the applicable regulations of the Texas Department of Public Safety and the United States DEA. These assertions remain unchallenged on appeal.

¶22 Because the text of the exemption is devoid of any reference to tribal status, we find no support for an interpretation limiting the exemption to tribal members. <u>See</u> <u>Boyll</u>, 774 F. Supp. at 1338 (holding that under the plain language of the federal Religious Peyote Exemption, the exemption applies to all members of the Native American Church, regardless of any tribal affiliation). The term "members" in the exemption clearly refers to members of the "Native American Church"--not to members of federally recognized tribes. Therefore, so long as their church is part of "[t]he Native American Church," the Mooneys may not be prosecuted for using peyote in bona fide religious ceremonies.

### B. Deference to the Federal Agency's Interpretation

¶23 In arguing that we should limit the applicability of the Religious Peyote Exemption to members of federally recognized tribes, the State maintains that we should defer to the interpretation of the DEA, the successor to the federal agency that promulgated the exemption. The State argues that the DEA applies the federal exemption only to members of federally recognized tribes.

¶24 We will defer to an agency's interpretation of its own regulation only if it is a reasonable interpretation of the regulatory language. Indeed, the United States Supreme Court has required that federal courts defer to the regulatory interpretation of a federal agency only if the language of the regulation "is not free from doubt" and if the interpretation is "reasonable" and "sensibly conforms to the wording and purpose" of the regulation. <u>Martin v. Occupational Safety & Health Review Comm'n</u>, 499 U.S. 144, 150-51 (1991) (citations and quotations omitted). No deference is otherwise required.

¶25 Whether a federal court must defer to the regulatory interpretation of a federal agency presents a different question from whether a state court is required to defer to a federal agency's interpretation of a federal regulation incorporated into state law. In the latter case, although we are free to consider the interpretation of a federal agency, we have no obligation to defer to that interpretation. In this case, in view of the plain language of the federal exemption and the due process concerns raised by the prosecution of Native American Church members whose activities fall within its plain language, we will not defer to any agency interpretation that would limit the federal exemption to members of

federally recognized tribes.

### C. Federal Policy Toward Native Americans

¶26 Finally, the State argues that an interpretation extending the federal exemption to members of the Native American Church who are not members of federally recognized tribes would violate the United States Constitution's Equal Protection Clause, because the exemption would be a religion-based preference permitting members of a particular church, and not others, to use peyote in religious ceremonies. The State maintains that an exemption for members of federally recognized tribes can survive constitutional scrutiny because it is a political preference designed to preserve tribal culture, rather than a constitutionally suspect racial preference.[4]

¶27 The State relies on Peyote Way, 922 F.2d at 1212, where the Fifth Circuit Court of Appeals held that the federal Equal Protection Clause permits the Religious Peyote Exemption's preference for Native American Church members because of the federal government's unique political relationship with Native American tribes, and that the Equal Protection Clause does not require that the exemption be extended to religious peyote users who are neither Native American Church members nor members of federally recognized tribes. See also U.S. Const. art. VIII, § 8, cl. 3 (giving Congress the power to regulate commerce with the "Indian Tribes"); Morton v. Mancari, 417 U.S. 535, 551 (1974) (recognizing the "unique legal status" of Native American tribes with respect to the federal government). The State therefore urges a regulatory interpretation that would limit the peyote exemption to members of federally recognized tribes, because a preference for such tribe members receives deference under the Supreme Court's equal protection jurisprudence.

¶28 These arguments do not persuade us to interpret the Religious Peyote Exemption in a way that contravenes the plain meaning of its terms. It is particularly important, as a safeguard for our citizens' due process rights, for us to remain faithful to the plain language of a statute when it would impose criminal penalties on those who violate it. While the constitutional arguments advanced by the State may be relevant to our statutory analysis, they are speculative and remote when compared with the tangible due process claims that the Mooneys would have were they to be prosecuted in violation of the plain language of the exemption.[5]

¶29 We also recognize that this case involves a prosecution under state, rather than federal, law. It is by no means clear that the federal government's duties to Native Americans, see Mancari, 417 U.S. at 551, would legitimize state efforts to limit religious preferences to members of federally recognized Native American tribes. It is similarly unclear whether an interpretation that extended the religious peyote exemption to only some members of the Native American Church would survive scrutiny under article I, section 4 of the Utah Constitution, which provides that "the State shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." Accordingly, despite the State's argument that some hypothetical equal protection claims might be leveled against the plain language interpretation we adopt today, we are constrained to interpret the incorporated regulation according to its plain meaning.

## CONCLUSION

¶30 We reverse the decision of the district court. We hold that the federal Religious Peyote Exemption found at 21 C.F.R. § 1307.31 has been incorporated into the Utah Controlled Substances Act. Although the statutory language governing incorporation is ambiguous, we interpret the Act in a manner that avoids a conflict with federal law and does not risk depriving the Mooneys of their constitutional rights to due process.

¶31 In interpreting the reach of the federal exemption as incorporated into Utah law, we rely on its plain language, electing not to defer to a contrary interpretation that the State argues has been adopted by the federal DEA. On its face, the exemption applies to members of the Native American Church, without regard to tribal membership. The bona fide religious use of peyote cannot serve as the basis for prosecuting members of the Native American Church under state law. We remand for reconsideration of the Mooneys' motion to dismiss in light of this opinion.

---

¶32 Chief Justice Durham, Associate Chief Justice Wilkins, Justice Durrant, and Justice Nehring concur in Justice Parrish's opinion.

1. The trial court did not expressly rule on this issue because it held that even if the Religious Peyote Exemption were incorporated into Utah law, the Mooneys would not qualify for it. This holding was

based on an interpretation of the regulation that limited its applicability to members of federally recognized tribes. Like issues of statutory interpretation, we review the trial court's interpretation of a regulation for correctness, giving no deference to the trial court's conclusions. See Brendle v. City of Draper, 937 P.2d 1044, 1046 (Utah Ct. App. 1997).

2. All of these are possible sources of exemptions in light of the fact that the definition of "Controlled Substance" under the Utah Controlled Substances Act includes substances scheduled under the federal Controlled Substances Act. Utah Code Ann. § 58-37-2(1)(e) (2002).

3. All of the constitutional analysis in this opinion is in the context of our attempt to interpret the statute and its incorporated regulation. Because we interpret the statute and incorporated regulation in a manner that avoids the constitutional issues raised by the Mooneys, we need not and do not consider the merits of the Mooneys' constitutional claims.

4. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995) (holding that equal protection jurisprudence requires the application of "strict scrutiny" to all racial classifications).

5. Any equal protection claims arising from our plain language interpretation of the regulatory exemption would not belong to the State, but rather to religious peyote users who are not members of the Native American Church. Cf. Peyote Way, 922 F.2d at 1212-21 (considering the equal protection claim of religious peyote users who were neither Native American tribe members nor Native American Church members). Because none of the parties to this proceeding fall within this category, the State's reliance on this equal protection argument is speculative at best.

# Plessy v. Ferguson, 163 U.S. 537 (1896)

# U.S. Supreme Court

Plessy v. Ferguson, 163 U.S. 537 (1896)

**Plessy v. Ferguson**

**No. 210**

**Argued April 18, 1896**

**Decided May 18, 1896**

**163 U.S. 537**

*ERROR TO THE SUPREME COURT OF THE STATE OF LOUISIANA*

*Syllabus*

The statute of Louisiana, acts of 1890, c. 111, requiring railway companies carrying passengers in their coaches in that State, to provide equal, but separate, accommodations for the white and colored races, by providing two or more passenger coaches for each passenger train, or by dividing the passenger coaches by a partition so as to secure separate accommodations; and providing that no person shall be permitted to occupy seats in coaches other than the ones assigned to them, on account

Page 163 U. S. 538

of the race they belong to; and requiring the officer of the passenger train to assign each passenger to the coach or compartment assigned for the race to which he or she belong; and imposing fines or imprisonment upon passengers insisting on going into a coach or compartment other than the one set aide for the race to which he or she belongs; and conferring upon officers of the train power to refuse to carry on the train passengers refusing to occupy the coach or compartment assigned to them, and exempting the railway company from liability for such refusal, are not in conflict with the provisions either of the Thirteenth Amendment or of the Fourteenth Amendment to the Constitution of the United States.

This was a petition for writs of prohibition and certiorari, originally filed in the Supreme Court of the State by Plessy, the plaintiff in error, against the Hon. John H. Ferguson, judge of the criminal District Court for the parish of Orleans, and setting forth in substance the following facts:

That petitioner was a citizen of the United States and a resident of the State of Louisiana, of mixed descent, in the proportion of seven eighths Caucasian and one eighth African blood; that the mixture of colored blood was not discernible in him, and that he was entitled to every recognition, right, privilege and immunity secured to the citizens of the United States of the white race by its Constitution and laws; that, on June 7, 1892, he engaged and paid for a first class passage on the East Louisiana Railway from New Orleans to Covington, in the same State, and thereupon entered a passenger train, and took possession of a vacant seat in a coach where passengers of the white race were accommodated; that such railroad company was incorporated by the laws of Louisiana as a common carrier, and was not authorized to distinguish between citizens according to their race. But, notwithstanding this, petitioner was required by the conductor, under penalty of ejection from said train and imprisonment, to vacate said coach and occupy another seat in a coach assigned by said company for persons not of the white

race, and for no other reason than that petitioner was of the colored race; that, upon petitioner's refusal to comply with such order, he was, with the aid of a police officer, forcibly ejected from said coach and hurried off to and imprisoned in the parish jail of

Page 163 U. S. 539

New Orleans, and there held to answer a charge made by such officer to the effect that he was guilty of having criminally violated an act of the General Assembly of the State, approved July 10, 1890, in such case made and provided.

That petitioner was subsequently brought before the recorder of the city for preliminary examination and committed for trial to the criminal District Court for the parish of Orleans, where an information was filed against him in the matter above set forth, for a violation of the above act, which act the petitioner affirmed to be null and void, because in conflict with the Constitution of the United States; that petitioner interposed a plea to such information based upon the unconstitutionality of the act of the General Assembly, to which the district attorney, on behalf of the State, filed a demurrer; that, upon issue being joined upon such demurrer and plea, the court sustained the demurrer, overruled the plea, and ordered petitioner to plead over to the facts set forth in the information, and that, unless the judge of the said court be enjoined by a writ of prohibition from further proceeding in such case, the court will proceed to fine and sentence petitioner to imprisonment, and thus deprive him of his constitutional rights set forth in his said plea, notwithstanding the unconstitutionality of the act under which he was being prosecuted; that no appeal lay from such sentence, and petitioner was without relief or remedy except by writs of prohibition and certiorari. Copies of the information and other proceedings in the criminal District Court were annexed to the petition as an exhibit.

Upon the filing of this petition, an order was issued upon the respondent to show cause why a writ of prohibition should not issue and be made perpetual, and a further order that the record of the proceedings had in the criminal cause be certified and transmitted to the Supreme Court.

To this order the respondent made answer, transmitting a certified copy of the proceedings, asserting the constitutionality of the law, and averring that, instead of pleading or admitting that he belonged to the colored race, the said Plessy declined and refused, either by pleading or otherwise, to admit

Page 163 U. S. 540

that he was in any sense or in any proportion a colored man.

The case coming on for a hearing before the Supreme Court, that court was of opinion that the law under which the prosecution was had was constitutional, and denied the relief prayed for by the petitioner. *Ex parte Plessy*, 45 La.Ann. 80. Whereupon petitioner prayed for a writ of error from this court, which was allowed by the Chief Justice of the Supreme Court of Louisiana.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

This case turns upon the constitutionality of an act of the General Assembly of the State of Louisiana, passed in 1890, providing for separate railway carriages for the white and colored races. Acts 1890, No.

111, p. 152.

The first section of the statute enacts

"that all railway companies carrying passengers in their coaches in this State shall provide equal but separate accommodations for the white and colored races by providing two or more passenger coaches for each passenger train, or by dividing the passenger coaches by a partition so as to secure separate accommodations: *Provided,* That this section shall not be construed to apply to street railroads. No person or persons, shall be admitted to occupy seats in coaches other than the ones assigned to them on account of the race they belong to."

By the second section, it was enacted

"that the officers of such passenger trains shall have power and are hereby required

Page 163 U. S. 541

to assign each passenger to the coach or compartment used for the race to which such passenger belongs; any passenger insisting on going into a coach or compartment to which by race he does not belong shall be liable to a fine of twenty-five dollars, or in lieu thereof to imprisonment for a period of not more than twenty days in the parish prison, and any officer of any railroad insisting on assigning a passenger to a coach or compartment other than the one set aside for the race to which said passenger belongs shall be liable to a fine of twenty-five dollars, or in lieu thereof to imprisonment for a period of not more than twenty days in the parish prison; and should any passenger refuse to occupy the coach or compartment to which he or she is assigned by the officer of such railway, said officer shall have power to refuse to carry such passenger on his train, and for such refusal neither he nor the railway company which he represents shall be liable for damages in any of the courts of this State."

The third section provides penalties for the refusal or neglect of the officers, directors, conductors, and employees of railway companies to comply with the act, with a proviso that "nothing in this act shall be construed as applying to nurses attending children of the other race." The fourth section is immaterial.

The information filed in the criminal District Court charged in substance that Plessy, being a passenger between two stations within the State of Louisiana, was assigned by officers of the company to the coach used for the race to which he belonged, but he insisted upon going into a coach used by the race to which he did not belong. Neither in the information nor plea was his particular race or color averred. The petition for the writ of prohibition averred that petitioner was seven-eighths Caucasian and one eighth African blood; that the mixture of colored blood was not discernible in him, and that he was entitled to every right, privilege and immunity secured to citizens of the United States of the white race; and that, upon such theory, he took possession of a vacant seat in a coach where passengers of the white race were accommodated, and was ordered by the conductor to vacate

Page 163 U. S. 542

said coach and take a seat in another assigned to persons of the colored race, and, having refused to comply with such demand, he was forcibly ejected with the aid of a police officer, and imprisoned in

the parish jail to answer a charge of having violated the above act.

The constitutionality of this act is attacked upon the ground that it conflicts both with the Thirteenth Amendment of the Constitution, abolishing slavery, and the Fourteenth Amendment, which prohibits certain restrictive legislation on the part of the States.

1. That it does not conflict with the Thirteenth Amendment, which abolished slavery and involuntary servitude, except as a punishment for crime, is too clear for argument. Slavery implies involuntary servitude -- a state of bondage; the ownership of mankind as a chattel, or at least the control of the labor and services of one man for the benefit of another, and the absence of a legal right to the disposal of his own person, property and services. This amendment was said in the *Slaughterhouse Cases,* 16 Wall. 36, to have been intended primarily to abolish slavery as it had been previously known in this country, and that it equally forbade Mexican peonage or the Chinese coolie trade when they amounted to slavery or involuntary servitude, and that the use of the word "servitude" was intended to prohibit the use of all forms of involuntary slavery, of whatever class or name. It was intimated, however, in that case that this amendment was regarded by the statesmen of that day as insufficient to protect the colored race from certain laws which had been enacted in the Southern States, imposing upon the colored race onerous disabilities and burdens and curtailing their rights in the pursuit of life, liberty and property to such an extent that their freedom was of little value; and that the Fourteenth Amendment was devised to meet this exigency.

So, too, in the *Civil Rights Cases,* 109 U. S. 3, 109 U. S. 24, it was said that the act of a mere individual, the owner of an inn, a public conveyance or place of amusement, refusing accommodations to colored people cannot be justly regarded as imposing any badge of slavery or servitude upon the applicant, but

Page 163 U. S. 543

only as involving an ordinary civil injury, properly cognizable by the laws of the State and presumably subject to redress by those laws until the contrary appears. "It would be running the slavery argument into the ground," said Mr. Justice Bradley,

"to make it apply to every act of discrimination which a person may see fit to make as to the guests he will entertain, or as to the people he will take into his coach or cab or car, or admit to his concert or theatre, or deal with in other matters of intercourse or business."

A statute which implies merely a legal distinction between the white and colored races -- a distinction which is founded in the color of the two races and which must always exist so long as white men are distinguished from the other race by color -- has no tendency to destroy the legal equality of the two races, or reestablish a state of involuntary servitude. Indeed, we do not understand that the Thirteenth Amendment is strenuously relied upon by the plaintiff in error in this connection.

2. By the Fourteenth Amendment, all persons born or naturalized in the United States and subject to the jurisdiction thereof are made citizens of the United States and of the State wherein they reside, and the States are forbidden from making or enforcing any law which shall abridge the privileges or

immunities of citizens of the United States, or shall deprive any person of life, liberty, or property without due process of law, or deny to any person within their jurisdiction the equal protection of the laws.

The proper construction of this amendment was first called to the attention of this court in the *Slaughterhouse Cases,* 16 Wall. 36, which involved, however, not a question of race, but one of exclusive privileges. The case did not call for any expression of opinion as to the exact rights it was intended to secure to the colored race, but it was said generally that its main purpose was to establish the citizenship of the negro, to give definitions of citizenship of the United States and of the States, and to protect from the hostile legislation of the States the privileges and immunities of citizens of the United States, as distinguished from those of citizens of the States.

Page 163 U. S. 544

The object of the amendment was undoubtedly to enforce the absolute equality of the two races before the law, but, in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political, equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation in places where they are liable to be brought into contact do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power even by courts of States where the political rights of the colored race have been longest and most earnestly enforced.

One of the earliest of these cases is that of *Roberts v. City of Boston,* 5 Cush. 19, in which the Supreme Judicial Court of Massachusetts held that the general school committee of Boston had power to make provision for the instruction of colored children in separate schools established exclusively for them, and to prohibit their attendance upon the other schools. "The great principle," said Chief Justice Shaw, p. 206, "advanced by the learned and eloquent advocate for the plaintiff" (Mr. Charles Sumner),

"is that, by the constitution and laws of Massachusetts, all persons without distinction of age or sex, birth or color, origin or condition, are equal before the law. . . . But when this great principle comes to be applied to the actual and various conditions of persons in society, it will not warrant the assertion that men and women are legally clothed with the same civil and political powers, and that children and adults are legally to have the same functions and be subject to the same treatment, but only that the rights of all, as they are settled and regulated by law, are equally entitled to the paternal consideration and protection of the law for their maintenance and security."

It was held that the powers of the committee extended to the establishment

Page 163 U. S. 545

of separate schools for children of different ages, sexes and colors, and that they might also establish special schools for poor and neglected children, who have become too old to attend the primary school

and yet have not acquired the rudiments of learning to enable them to enter the ordinary schools. Similar laws have been enacted by Congress under its general power of legislation over the District of Columbia, Rev.Stat.D.C. §§ 281, 282, 283, 310, 319, as well as by the legislatures of many of the States, and have been generally, if not uniformly, sustained by the courts. *State v. McCann,* 21 Ohio St. 198; *Lehew v. Brummell,* 15 S.W.Rep. 765; *Ward v. Flood,* 48 California 36; *Bertonneau v. School Directors,* 3 Woods 177; *People v. Gallagher,* 93 N.Y. 438; *Cory v. Carter,* 48 Indiana 897; *Dawson v. Lee,* 3 Kentucky 49.

Laws forbidding the intermarriage of the two races may be said in a technical sense to interfere with the freedom of contract, and yet have been universally recognized as within the police power of the State. *State v. Gibson,* 36 Indiana 389.

The distinction between laws interfering with the political equality of the negro and those requiring the separation of the two races in schools, theatres and railway carriages has been frequently drawn by this court. Thus, in *Strauder v. West Virginia,* 100 U. S. 303, it was held that a law of West Virginia limiting to white male persons, 21 years of age and citizens of the State, the right to sit upon juries was a discrimination which implied a legal inferiority in civil society, which lessened the security of the right of the colored race, and was a step toward reducing them to a condition of servility. Indeed, the right of a colored man that, in the selection of jurors to pass upon his life, liberty and property, there shall be no exclusion of his race and no discrimination against them because of color has been asserted in a number of cases. *Virginia v. Rives,* 100 U. S. 313; *Neal v. Delaware,* 103 U. S. 370; *Bush v. Kentucky,* 107 U. S. 110; *Gibson v. Mississippi,* 162 U. S. 565. So, where the laws of a particular locality or the charter of a particular railway corporation has provided that no person shall be excluded from the cars on account of

Page 163 U. S. 546

color, we have held that this meant that persons of color should travel in the same car as white ones, and that the enactment was not satisfied by the company's providing cars assigned exclusively to people of color, though they were as good as those which they assigned exclusively to white persons. *Railroad Company v. Brown,* 17 Wall. 445.

Upon the other hand, where a statute of Louisiana required those engaged in the transportation of passengers among the States to give to all persons traveling within that State, upon vessels employed in that business, equal rights and privileges in all parts of the vessel, without distinction on account of race or color, and subjected to an action for damages the owner of such a vessel, who excluded colored passengers on account of their color from the cabin set aside by him for the use of whites, it was held to be, so far as it applied to interstate commerce, unconstitutional and void. *Hall v. De Cuir,* 95 U. S. 48. The court in this case, however, expressly disclaimed that it had anything whatever to do with the statute as a regulation of internal commerce, or affecting anything else than commerce among the States.

In the *Civil Rights Case,* 109 U. S. 3, it was held that an act of Congress entitling all persons within the jurisdiction of the United States to the full and equal enjoyment of the accommodations, advantages,

facilities and privileges of inns, public conveyances, on land or water, theatres and other places of public amusement, and made applicable to citizens of every race and color, regardless of any previous condition of servitude, was unconstitutional and void upon the ground that the Fourteenth Amendment was prohibitory upon the States only, and the legislation authorized to be adopted by Congress for enforcing it was not direct legislation on matters respecting which the States were prohibited from making or enforcing certain laws, or doing certain acts, but was corrective legislation such as might be necessary or proper for counteracting and redressing the effect of such laws or acts. In delivering the opinion of the court, Mr. Justice Bradley observed that the Fourteenth Amendment

"does not invest Congress with power to legislate upon subjects that are within the

Page 163 U. S. 547

domain of state legislation, but to provide modes of relief against state legislation or state action of the kind referred to. It does not authorize Congress to create a code of municipal law for the regulation of private rights, but to provide modes of redress against the operation of state laws and the action of state officers, executive or judicial, when these are subversive of the fundamental rights specified in the amendment. Positive rights and privileges are undoubtedly secured by the Fourteenth Amendment, but they are secured by way of prohibition against state laws and state proceedings affecting those rights and privileges, and by power given to Congress to legislate for the purpose of carrying such prohibition into effect, and such legislation must necessarily be predicated upon such supposed state laws or state proceedings, and be directed to the correction of their operation and effect."

Much nearer, and, indeed, almost directly in point is the case of the *Louisville, New Orleans &c. Railway v. Mississippi,* 133 U. S. 587, wherein the railway company was indicted for a violation of a statute of Mississippi enacting that all railroads carrying passengers should provide equal but separate accommodations for the white and colored races by providing two or more passenger cars for each passenger train, or by dividing the passenger cars by a partition so as to secure separate accommodations. The case was presented in a different aspect from the one under consideration, inasmuch as it was an indictment against the railway company for failing to provide the separate accommodations, but the question considered was the constitutionality of the law. In that case, the Supreme Court of Mississippi, 66 Mississippi 662, had held that the statute applied solely to commerce within the State, and that, being the construction of the state statute by its highest court, was accepted as conclusive. "If it be a matter," said the court, p. 591,

"respecting commerce wholly within a State, and not interfering with commerce between the States, then obviously there is no violation of the commerce clause of the Federal Constitution. . . . No question arises under this section as to the power of the State to separate in different compartments interstate passengers

Page 163 U. S. 548

or affect in any manner the privileges and rights of such passengers. All that we can consider is whether the State has the power to require that railroad trains within her limits shall have separate accommodations for the two races; that affecting only commerce within the State is no invasion of the

power given to Congress by the commerce clause."

A like course of reasoning applies to the case under consideration, since the Supreme Court of Louisiana in the case of the *State ex rel. Abbott v. Hicks, Judge, et al.,* 44 La.Ann. 770, held that the statute in question did not apply to interstate passengers, but was confined in its application to passengers traveling exclusively within the borders of the State. The case was decided largely upon the authority of *Railway Co. v. State,* 66 Mississippi 662, and affirmed by this court in 133 U. S. 587. In the present case, no question of interference with interstate commerce can possibly arise, since the East Louisiana Railway appears to have been purely a local line, with both its termini within the State of Louisiana. Similar statutes for the separation of the races upon public conveyances were held to be constitutional in *West Chester &c. Railroad v. Miles,* 55 Penn.St. 209; *Day v. Owen,* 5 Michigan 520; *Chicago &c. Railway v. Williams,* 5 Illinois 185; *Chesapeake &c. Railroad v. Wells,* 85 Tennessee 613; *Memphis &c. Railroad v. Benson,* 85 Tennessee 627; *The Sue,* 22 Fed.Rep. 83; *Logwood v. Memphis &c. Railroad,* 23 Fed.Rep. 318; *McGuinn v. Forbes,* 37 Fed.Rep. 639; *People v. King,* 18 N.E.Rep. 245; *Houck v. South Pac. Railway,* 38 Fed.Rep. 226; *Heard v. Georgia Railroad Co.,* 3 Int.Com.Com'n 111; *S.C.,* 1 *Ibid.* 428.

While we think the enforced separation of the races, as applied to the internal commerce of the State, neither abridges the privileges or immunities of the colored man, deprives him of his property without due process of law, nor denies him the equal protection of the laws within the meaning of the Fourteenth Amendment, we are not prepared to say that the conductor, in assigning passengers to the coaches according to their race, does not act at his peril, or that the provision of the second section of the act that denies to the passenger compensation

Page 163 U. S. 549

in damages for a refusal to receive him into the coach in which he properly belongs is a valid exercise of the legislative power. Indeed, we understand it to be conceded by the State's Attorney that such part of the act as exempts from liability the railway company and its officers is unconstitutional. The power to assign to a particular coach obviously implies the power to determine to which race the passenger belongs, as well as the power to determine who, under the laws of the particular State, is to be deemed a white and who a colored person. This question, though indicated in the brief of the plaintiff in error, does not properly arise upon the record in this case, since the only issue made is as to the unconstitutionality of the act so far as it requires the railway to provide separate accommodations and the conductor to assign passengers according to their race.

It is claimed by the plaintiff in error that, in any mixed community, the reputation of belonging to the dominant race, in this instance the white race, is property in the same sense that a right of action or of inheritance is property. Conceding this to be so for the purposes of this case, we are unable to see how this statute deprives him of, or in any way affects his right to, such property. If he be a white man and assigned to a colored coach, he may have his action for damages against the company for being deprived of his so-called property. Upon the other hand, if he be a colored man and be so assigned, he has been deprived of no property, since he is not lawfully entitled to the reputation of being a white man.

In this connection, it is also suggested by the learned counsel for the plaintiff in error that the same argument that will justify the state legislature in requiring railways to provide separate accommodations for the two races will also authorize them to require separate cars to be provided for people whose hair is of a certain color, or who are aliens, or who belong to certain nationalities, or to enact laws requiring colored people to walk upon one side of the street and white people upon the other, or requiring white men's houses to be painted white and colored men's black, or their vehicles or business signs to be of different colors, upon the theory that one side

Page 163 U. S. 550

of the street is as good as the other, or that a house or vehicle of one color is as good as one of another color. The reply to all this is that every exercise of the police power must be reasonable, and extend only to such laws as are enacted in good faith for the promotion for the public good, and not for the annoyance or oppression of a particular class. Thus, in *Yick Wo v. Hopkins,* 118 U. S. 356, it was held by this court that a municipal ordinance of the city of San Francisco to regulate the carrying on of public laundries within the limits of the municipality violated the provisions of the Constitution of the United States if it conferred upon the municipal authorities arbitrary power, at their own will and without regard to discretion, in the legal sense of the term, to give or withhold consent as to persons or places without regard to the competency of the persons applying or the propriety of the places selected for the carrying on of the business. It was held to be a covert attempt on the part of the municipality to make an arbitrary and unjust discrimination against the Chinese race. While this was the case of a municipal ordinance, a like principle has been held to apply to acts of a state legislature passed in the exercise of the police power. *Railroad Company v. Husen,* 95 U. S. 465; *Louisville & Nashville Railroad v. Kentucky,* 161 U. S. 677, and cases cited on p. 161 U. S. 700; *Duggett v. Hudson,* 43 Ohio St. 548; *Capen v. Foster,* 12 Pick. 48; *State ex rel. Wood v. Baker,* 38 Wisconsin 71; *Monroe v. Collins,* 17 Ohio St. 66; *Hulseman v. Rems,* 41 Penn. St. 396; *Orman v. Riley,* 1 California 48.

So far, then, as a conflict with the Fourteenth Amendment is concerned, the case reduces itself to the question whether the statute of Louisiana is a reasonable regulation, and, with respect to this, there must necessarily be a large discretion on the part of the legislature. In determining the question of reasonableness, it is at liberty to act with reference to the established usages, customs, and traditions of the people, and with a view to the promotion of their comfort and the preservation of the public peace and good order. Gauged by this standard, we cannot say that a law which authorizes or even requires the separation of the two races in public conveyances

Page 163 U. S. 551

is unreasonable, or more obnoxious to the Fourteenth Amendment than the acts of Congress requiring separate schools for colored children in the District of Columbia, the constitutionality of which does not seem to have been questioned, or the corresponding acts of state legislatures.

We consider the underlying fallacy of the plaintiff's argument to consist in the assumption that the enforced separation of the two races stamps the colored race with a badge of inferiority. If this be so, it is not by reason of anything found in the act, but solely because the colored race chooses to put that

construction upon it. The argument necessarily assumes that if, as has been more than once the case and is not unlikely to be so again, the colored race should become the dominant power in the state legislature, and should enact a law in precisely similar terms, it would thereby relegate the white race to an inferior position. We imagine that the white race, at least, would not acquiesce in this assumption. The argument also assumes that social prejudices may be overcome by legislation, and that equal rights cannot be secured to the negro except by an enforced commingling of the two races. We cannot accept this proposition. If the two races are to meet upon terms of social equality, it must be the result of natural affinities, a mutual appreciation of each other's merits, and a voluntary consent of individuals. As was said by the Court of Appeals of New York in *People v. Gallagher,* 93 N. Y. 438, 448,

"this end can neither be accomplished nor promoted by laws which conflict with the general sentiment of the community upon whom they are designed to operate. When the government, therefore, has secured to each of its citizens equal rights before the law and equal opportunities for improvement and progress, it has accomplished the end for which it was organized, and performed all of the functions respecting social advantages with which it is endowed."

Legislation is powerless to eradicate racial instincts or to abolish distinctions based upon physical differences, and the attempt to do so can only result in accentuating the difficulties of the present situation. If the civil and political rights of both races be equal, one cannot be inferior to the other civilly

Page 163 U. S. 552

or politically. If one race be inferior to the other socially, the Constitution of the United States cannot put them upon the same plane.

It is true that the question of the proportion of colored blood necessary to constitute a colored person, as distinguished from a white person, is one upon which there is a difference of opinion in the different States, some holding that any visible admixture of black blood stamps the person as belonging to the colored race (*State v. Chaver,* 5 Jones [N.C.] 1, p. 11); others that it depends upon the preponderance of blood (*Gray v. State,* 4 Ohio 354; *Monroe v. Collins,* 17 Ohio St. 665); and still others that the predominance of white blood must only be in the proportion of three-fourths. (*People v. Dean,* 4 Michigan 406; *Jones v. Commonwealth,* 80 Virginia 538). But these are questions to be determined under the laws of each State, and are not properly put in issue in this case. Under the allegations of his petition, it may undoubtedly become a question of importance whether, under the laws of Louisiana, the petitioner belongs to the white or colored race.

The judgment of the court below is, therefore,

*Affirmed.*

MR. JUSTICE HARLAN, dissenting.

By the Louisiana statute the validity of which is here involved, all railway companies (other than street railroad companies) carrying passengers in that State are required to have separate but equal accommodations for white and colored persons

"by providing two or more passenger coaches for each passenger train, or by dividing the passenger coaches by a partition so as to secure separate accommodations."

Under this statute, no colored person is permitted to occupy a seat in a coach assigned to white persons, nor any white person to occupy a seat in a coach assigned to colored persons. The managers of the railroad are not allowed to exercise any discretion in the premises, but are required to assign each passenger to some coach or compartment set apart for the exclusive use of his race. If a passenger insists upon going into a coach or compartment not set apart for persons of his race,

Page 163 U. S. 553

he is subject to be fined or to be imprisoned in the parish jail. Penalties are prescribed for the refusal or neglect of the officers, directors, conductors and employees of railroad companies to comply with the provisions of the act.

Only "nurses attending children of the other race " are excepted from the operation of the statute. No exception is made of colored attendants traveling with adults. A white man is not permitted to have his colored servant with him in the same coach, even if his condition of health requires the constant, personal assistance of such servant. If a colored maid insists upon riding in the same coach with a white woman whom she has been employed to serve, and who may need her personal attention while traveling, she is subject to be fined or imprisoned for such an exhibition of zeal in the discharge of duty.

While there may be in Louisiana persons of different races who are not citizens of the United States, the words in the act "white and colored races" necessarily include all citizens of the United States of both races residing in that State. So that we have before us a state enactment that compels, under penalties, the separation of the two races in railroad passenger coaches, and makes it a crime for a citizen of either race to enter a coach that has been assigned to citizens of the other race.

Thus, the State regulates the use of a public highway by citizens of the United States solely upon the basis of race.

However apparent the injustice of such legislation may be, we have only to consider whether it is consistent with the Constitution of the United States.

That a railroad is a public highway, and that the corporation which owns or operates it is in the exercise of public functions, is not, at this day, to be disputed. Mr. Justice Nelson, speaking for this court in *New Jersey Steam Navigation Co. v. Merchants' Bank,* 6 How. 344, 47 U. S. 382, said that a common carrier was in the exercise

"of a sort of public office, and has public duties to perform, from which he should not be permitted to exonerate himself without the assent of the parties concerned."

Mr. Justice Strong, delivering the judgment of

Page 163 U. S. 554

this court in *Olcott v. The Supervisors,* 16 Wall. 678, 83 U. S. 694, said:

"That railroads, though constructed by private corporations and owned by them, are public highways has been the doctrine of nearly all the courts ever since such conveniences for passage and transportation have had any existence. Very early the question arose whether a State's right of eminent domain could be exercised by a private corporation created for the purpose of constructing a railroad. Clearly it could not unless taking land for such a purpose by such an agency is taking land for public use. The right of eminent domain nowhere justifies taking property for a private use. Yet it is a doctrine universally accepted that a state legislature may authorize a private corporation to take land for the construction of such a road, making compensation to the owner. What else does this doctrine mean if not that building a railroad, though it be built by a private corporation, is an act done for a public use."

So, in *Township of Pine Grove v. Talcott,* 19 Wall. 666, 86 U. S. 676: "Though the corporation [a railroad company] was private, its work was public, as much so as if it were to be constructed by the State." So, in *Inhabitants of Worcester v. Western Railroad Corporation,* 4 Met. 564:

"The establishment of that great thoroughfare is regarded as a public work, established by public authority, intended for the public use and benefit, the use of which is secured to the whole community, and constitutes, therefore, like a canal, turnpike or highway, a public easement. It is true that the real and personal property necessary to the establishment and management of the railroad is vested in the corporation, but it is in trust for the public."

In respect of civil rights common to all citizens, the Constitution of the United States does not, I think, permit any public authority to know the race of those entitled to be protected in the enjoyment of such rights. Every true man has pride of race, and, under appropriate circumstances, when the rights of others, his equals before the law, are not to be affected, it is his privilege to express such pride and to take such action based upon it as to him seems proper. But I deny that any legislative body or judicial tribunal may have regard to the

Page 163 U. S. 555

race of citizens when the civil rights of those citizens are involved. Indeed, such legislation as that here in question is inconsistent not only with that equality of rights which pertains to citizenship, National and State, but with the personal liberty enjoyed by everyone within the United States.

The Thirteenth Amendment does not permit the withholding or the deprivation of any right necessarily inhering in freedom. It not only struck down the institution of slavery as previously existing in the United States, but it prevents the imposition of any burdens or disabilities that constitute badges of slavery or servitude. It decreed universal civil freedom in this country. This court has so adjudged. But that amendment having been found inadequate to the protection of the rights of those who had been in slavery, it was followed by the Fourteenth Amendment, which added greatly to the dignity and glory of American citizenship and to the security of personal liberty by declaring that

"all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside,"

and that

"no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

These two amendments, if enforced according to their true intent and meaning, will protect all the civil rights that pertain to freedom and citizenship. Finally, and to the end that no citizen should be denied, on account of his race, the privilege of participating in the political control of his country, it as declared by the Fifteenth Amendment that

"the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color or previous condition of servitude."

These notable additions to the fundamental law were welcomed by the friends of liberty throughout the world. They removed the race line from our governmental systems. They had, as this court has said, a common purpose, namely to secure

"to a race recently emancipated, a race that through

Page 163 U. S. 556

many generations have been held in slavery, all the civil rights that the superior race enjoy."

They declared, in legal effect, this court has further said,

"that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color."

We also said:

"The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race -- the right to exemption from unfriendly legislation against them distinctively as colored -- exemption from legal discriminations, implying inferiority in civil society, Lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race."

It was, consequently, adjudged that a state law that excluded citizens of the colored race from juries, because of their race and however well qualified in other respects to discharge the duties of jurymen, was repugnant to the Fourteenth Amendment. *Strauder v. West Virginia*, 100 U. S. 303, 100 U. S. 306, 100 U. S. 307; *Virginia v. Rives*, 100 U. S. 313; *Ex parte Virginia*, 100 U. S. 339; *Neal v. Delaware*, 103 U. S. 370, 103 U. S. 386; *Bush v. Kentucky*, 107 U. S. 110, 107 U. S. 116. At the present term, referring to the previous adjudications, this court declared that

"underlying all of those decisions is the principle that the Constitution of the United States, in its present form, forbids, so far as civil and political rights are concerned, discrimination by the General Government or the States against any citizen because of his race. All citizens are equal before the law."

*Gibson v. Mississippi,* 162 U.S. 565.

The decisions referred to show the scope of the recent amendments of the Constitution. They also show that it is not within the power of a State to prohibit colored citizens, because of their race, from participating as jurors in the administration of justice.

It as said in argument that the statute of Louisiana does

Page 163 U. S. 557

not discriminate against either race, but prescribes a rule applicable alike to white and colored citizens. But this argument does not meet the difficulty. Everyone knows that the statute in question had its origin in the purpose not so much to exclude white persons from railroad cars occupied by blacks as to exclude colored people from coaches occupied by or assigned to white persons. Railroad corporations of Louisiana did not make discrimination among whites in the matter of accommodation for travelers. The thing to accomplish was, under the guise of giving equal accommodation for whites and blacks, to compel the latter to keep to themselves while traveling in railroad passenger coaches. No one would be so wanting in candor a to assert the contrary. The fundamental objection, therefore, to the statute is that it interferes with the personal freedom of citizens. "Personal liberty," it has been well said,

"consists in the power of locomotion, of changing situation, or removing one's person to whatsoever places one's own inclination may direct, without imprisonment or restraint unless by due course of law."

1 Bl.Com. *134. If a white man and a black man choose to occupy the same public conveyance on a public highway, it is their right to do so, and no government, proceeding alone on grounds of race, can prevent it without infringing the personal liberty of each.

It is one thing for railroad carriers to furnish, or to be required by law to furnish, equal accommodations for all whom they are under a legal duty to carry. It is quite another thing for government to forbid citizens of the white and black races from traveling in the same public conveyance, and to punish officers of railroad companies for permitting persons of the two races to occupy the same passenger coach. If a State can prescribe, as a rule of civil conduct, that whites and blacks shall not travel as passengers in the same railroad coach, why may it not so regulate the use of the streets of its cities and towns as to compel white citizens to keep on one side of a street and black citizens to keep on the other? Why may it not, upon like grounds, punish whites and blacks who ride together in streetcars or in open vehicles on a public road

Page 163 U. S. 558

or street? Why may it not require sheriffs to assign whites to one side of a courtroom and blacks to the other? And why may it not also prohibit the commingling of the two races in the galleries of legislative halls or in public assemblages convened for the consideration of the political questions of the day? Further, if this statute of Louisiana is consistent with the personal liberty of citizens, why may not the State require the separation in railroad coaches of native and naturalized citizens of the United States, or of Protestants and Roman Catholics?

The answer given at the argument to these questions was that regulations of the kind they suggest would be unreasonable, and could not, therefore, stand before the law. Is it meant that the determination of questions of legislative power depends upon the inquiry whether the statute whose validity is questioned is, in the judgment of the courts, a reasonable one, taking all the circumstances into consideration? A statute may be unreasonable merely because a sound public policy forbade its enactment. But I do not understand that the courts have anything to do with the policy or expediency of legislation. A statute may be valid and yet, upon grounds of public policy, may well be characterized as unreasonable. Mr. Sedgwick correctly states the rule when he says that, the legislative intention being clearly ascertained,

"the courts have no other duty to perform than to execute the legislative will, without any regard to their views as to the wisdom or justice of the particular enactment."

Stat. & Const.Constr. 324. There is a dangerous tendency in these latter days to enlarge the functions of the courts by means of judicial interference with the will of the people as expressed by the legislature. Our institutions have the distinguishing characteristic that the three departments of government are coordinate and separate. Each must keep within the limits defined by the Constitution. And the courts best discharge their duty by executing the will of the lawmaking power, constitutionally expressed, leaving the results of legislation to be dealt with by the people through their representatives. Statutes must always have a reasonable construction. Sometimes they are to be construed strictly; sometimes liberally, in order to carry out the legislative

Page 163 U. S. 559

will. But however construed, the intent of the legislature is to be respected, if the particular statute in question is valid, although the courts, looking at the public interests, may conceive the statute to be both unreasonable and impolitic. If the power exists to enact a statute, that ends the matter so far as the courts are concerned. The adjudged cases in which statutes have been held to be void because unreasonable are those in which the means employed by the legislature were not at all germane to the end to which the legislature was competent.

The white race deems itself to be the dominant race in this country. And so it is in prestige, in achievements, in education, in wealth and in power. So, I doubt not, it will continue to be for all time if it remains true to its great heritage and holds fast to the principles of constitutional liberty. But in view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved. It is therefore to be regretted that this high tribunal, the final expositor of the fundamental law of the land, has reached the conclusion that it is competent for a State to regulate the enjoyment by citizens of their civil rights solely upon the basis of race.

In my opinion, the judgment this day rendered will, in time, prove to be quite as pernicious as the

decision made by this tribunal in the *Dred Scott Case.* It was adjudged in that case that the descendants of Africans who were imported into this country and sold as slaves were not included nor intended to be included under the word "citizens" in the Constitution, and could not claim any of the rights and privileges which that instrument provided for and secured to citizens of the United States; that, at the time of the adoption of the Constitution, they were

"considered as a subordinate and inferior class of beings, who had been subjugated by the dominant

Page 163 U. S. 560

race, and, whether emancipated or not, yet remained subject to their authority, and had no rights or privileges but such as those who held the power and the government might choose to grant them."

19 How. 60 U. S. 393, 60 U. S. 404. The recent amendments of the Constitution, it was supposed, had eradicated these principles from our institutions. But it seems that we have yet, in some of the States, a dominant race -- a superior class of citizens, which assumes to regulate the enjoyment of civil rights, common to all citizens, upon the basis of race. The present decision, it may well be apprehended, will not only stimulate aggressions, more or less brutal and irritating, upon the admitted rights of colored citizens, but will encourage the belief that it is possible, by means of state enactments, to defeat the beneficent purposes which the people of the United States had in view when they adopted the recent amendments of the Constitution, by one of which the blacks of this country were made citizens of the United States and of the States in which they respectively reside, and whose privileges and immunities, as citizens, the States are forbidden to abridge. Sixty millions of whites are in no danger from the presence here of eight millions of blacks. The destinies of the two races in this country are indissolubly linked together, and the interests of both require that the common government of all shall not permit the seeds of race hate to be planted under the sanction of law. What can more certainly arouse race hate, what more certainly create and perpetuate a feeling of distrust between these races, than state enactments which, in fact, proceed on the ground that colored citizens are so inferior and degraded that they cannot be allowed to sit in public coaches occupied by white citizens. That, as all will admit, is the real meaning of such legislation as was enacted in Louisiana.

The sure guarantee of the peace and security of each race is the clear, distinct, unconditional recognition by our governments, National and State, of every right that inheres in civil freedom, and of the equality before the law of all citizens of the United States, without regard to race. State enactments regulating the enjoyment of civil rights upon the basis of race, and cunningly devised to defeat legitimate results of the

Page 163 U. S. 561

war under the pretence of recognizing equality of rights, can have no other result than to render permanent peace impossible and to keep alive a conflict of races the continuance of which must do harm to all concerned. This question is not met by the suggestion that social equality cannot exist between the white and black races in this country. That argument, if it can be properly regarded as one, is scarcely worthy of consideration, for social equality no more exists between two races when traveling in a passenger coach or a public highway than when members of the same races sit by each

other in a street car or in the jury box, or stand or sit with each other in a political assembly, or when they use in common the street of a city or town, or when they are in the same room for the purpose of having their names placed on the registry of voters, or when they approach the ballot box in order to exercise the high privilege of voting.

There is a race so different from our own that we do not permit those belonging to it to become citizens of the United States. Persons belonging to it are, with few exceptions, absolutely excluded from our country. I allude to the Chinese race. But, by the statute in question, a Chinaman can ride in the same passenger coach with white citizens of the United States, while citizens of the black race in Louisiana, many of whom, perhaps, risked their lives for the preservation of the Union, who are entitled, by law, to participate in the political control of the State and nation, who are not excluded, by law or by reason of their race, from public stations of any kind, and who have all the legal rights that belong to white citizens, are yet declared to be criminals, liable to imprisonment, if they ride in a public coach occupied by citizens of the white race. It is scarcely just to say that a colored citizen should not object to occupying a public coach assigned to his own race. He does not object, nor, perhaps, would he object to separate coaches for his race if his rights under the law were recognized. But he objecting, and ought never to cease objecting, to the proposition that citizens of the white and black race can be adjudged criminals because they sit, or claim the right to sit, in the same public coach on a public highway.

Page 163 U. S. 562

The arbitrary separation of citizens on the basis of race while they are on a public highway is a badge of servitude wholly inconsistent with the civil freedom and the equality before the law established by the Constitution. It cannot be justified upon any legal grounds.

If evils will result from the commingling of the two races upon public highways established for the benefit of all, they will be infinitely less than those that will surely come from state legislation regulating the enjoyment of civil rights upon the basis of race. We boast of the freedom enjoyed by our people above all other peoples. But it is difficult to reconcile that boast with a state of the law which, practically, puts the brand of servitude and degradation upon a large class of our fellow citizens, our equals before the law. The thin disguise of "equal" accommodations for passengers in railroad coaches will not mislead anyone, nor atone for the wrong this day done.

The result of the whole matter is that, while this court has frequently adjudged, and at the present term has recognized the doctrine, that a State cannot, consistently with the Constitution of the United States, prevent white and black citizens, having the required qualifications for jury service, from sitting in the same jury box, it is now solemnly held that a State may prohibit white and black citizens from sitting in the same passenger coach on a public highway, or may require that they be separated by a "partition," when in the same passenger coach. May it not now be reasonably expected that astute men of the dominant race, who affect to be disturbed at the possibility that the integrity of the white race may be corrupted, or that its supremacy will be imperiled, by contact on public highways with black people, will endeavor to procure statutes requiring white and black jurors to be separated in the jury box by a "partition," and that, upon retiring from the courtroom to consult as to their verdict, such partition, if it be a moveable one, shall be taken to their consultation room and set up in such way as to prevent black

jurors from coming too close to their brother jurors of the white race. If the "partition" used in the courtroom happens to be stationary, provision could be made for screens with openings through

Page 163 U. S. 563

which jurors of the two races could confer as to their verdict without coming into personal contact with each other. I cannot see but that, according to the principles this day announced, such state legislation, although conceived in hostility to, and enacted for the purpose of humiliating, citizens of the United States of a particular race, would be held to be consistent with the Constitution.

I do not deem it necessary to review the decisions of state courts to which reference was made in argument. Some, and the most important, of them are wholly inapplicable because rendered prior to the adoption of the last amendments of the Constitution, when colored people had very few rights which the dominant race felt obliged to respect. Others were made at a time when public opinion in many localities was dominated by the institution of slavery, when it would not have been safe to do justice to the black man, and when, so far as the rights of blacks were concerned, race prejudice was, practically, the supreme law of the land. Those decisions cannot be guides in the era introduced by the recent amendments of the supreme law, which established universal civil freedom, gave citizenship to all born or naturalized in the United States and residing here, obliterated the race line from our systems of governments, National and State, and placed our free institutions upon the broad and sure foundation of the equality of all men before the law.

I am of opinion that the statute of Louisiana is inconsistent with the personal liberty of citizens, white and black, in that State, and hostile to both the spirit and letter of the Constitution of the United States. If laws of like character should be enacted in the several States of the Union, the effect would be in the highest degree mischievous. Slavery, as an institution tolerated by law would, it is true, have disappeared from our country, but there would remain a power in the States, by sinister legislation, to interfere with the full enjoyment of the blessings of freedom to regulate civil rights, common to all citizens, upon the basis of race, and to place in a condition of legal inferiority a large body of American citizens now constituting a part of the political community called the

Page 163 U. S. 564

People of the United States, for whom and by whom, through representatives, our government is administered. Such a system is inconsistent with the guarantee given by the Constitution to each State of a republican form of government, and may be stricken down by Congressional action, or by the courts in the discharge of their solemn duty to maintain the supreme law of the land, anything in the constitution or laws of any State to the contrary notwithstanding.

For the reasons stated, I am constrained to withhold my assent from the opinion and judgment of the majority.

MR. JUSTICE BREWER did not hear the argument or participate in the decision of this case.